## EDWARD P. ALLIS CO. v. COLUMBIA MILL CO

(Circuit Court of Appeals, Eighth Circuit. December 10, 1894.)

### No. 493.

**1. EVIDENCE—BREACH OF GUARANTY OF CAPACITY OF MILL.**
 The A. Co., millwrights, made a contract with the C. Mill Co. to construct an addition to its flour mill, the contract containing a guaranty that the enlarged mill should "have a daily working capacity of production of 400 barrels in excess of present capacity under equal conditions, and shall produce a barrel of flour of all grades, from not more than 4 $^{16}/_{60}$ bushels of a mixture of $\frac{1}{3}$ No. 1 hard, $\frac{1}{3}$ No. 1 Northern, and $\frac{1}{3}$ No. 2 Northern grades of spring milling wheat. The percentage of production of patent flour to be not less than 75 per cent., and equal to Pillsbury's Best of present quality." After the completion of the work, a controversy arose as to the fulfillment of the guaranty. *Held*, that the C. Mill Co., in proving a failure to comply with its terms, was not restricted to evidence of a test of the mill on some particular occasion, with a mixture of wheat exactly such as described in the guaranty, but that evidence of the total output of the mill during a period of 57 days after the enlargement was both competent and material to show either the extent of the increased capacity of the mill or its ability to produce the stipulated grade of flour in the stipulated proportion, the mill having been supplied during such time with a considerable quantity of the particular mixture of wheat referred to in the guaranty, and with other kinds well suited to test its capacity and the grade of its production.

**2. EXPERT TESTIMONY—RENTAL VALUE.**
 An expert witness, called to testify as to the rental value of a mill, after giving his opinion as to the rental value, stated, on cross-examination, that in forming his estimate he had taken into account the amount of production, cost of production, and probable rate of net profits, and that mill owners, in estimating the rental value of such property, were accustomed to consider its earning capacity. *Held*, that his opinion as to rental value was not rendered incompetent as authorizing a recovery for net profits by the statement made on cross-examination.

In Error to the Circuit Court of the United States for the District of Minnesota.

This was an action by the Edward P. Allis Company against the Columbia Mill Company, consolidated with a suit brought by the latter company against the former by an order directing that the cause of action for breach of a guaranty in the Columbia Mill Company's action should be treated as a counterclaim in the consolidated

action. On the trial in the circuit court the Columbia Mill Company had a verdict. The Edward P. Allis Company brings error.

This was a suit growing out of the alleged nonperformance of a contract which was entered into by and between the Edward P. Allis Company, the plaintiff in error, and the Columbia Mill Company, the defendant in error, on or about the 8th day of August, 1890. The contract was in the form of a proposal made by the Edward P. Allis Company to the Columbia Mill Company for the enlargement of its mill, which proposal was accepted by the latter company. The material parts thereof are as follows:

"Minneapolis, Minn., August 4, 1890.

\* \* \* \* \* \* \* \* \* \* \*

"To Columbia Mill Company, Minneapolis, Minn.—Dear Sirs: We propose to furnish you, f. o. b. cars at Milwaukee, Wis., the following machinery, viz.: 50 No. 4, Gray's Patent Flour Dressers; 30 No. 4, Reliance Scalpers & Graders; \* \* \* 11 No. 4, Gray's Centrifugal Reels; 8 9x24 Gray's Double Corrugated Roller Mills,—for the sum of sixteen thousand nine hundred thirty-five dollars ($16,935.00). All the above machinery to be of [the] latest improved construction, and complete in every particular, and to be used in connection with the present machinery now in use in the Columbia Mill for enlarging and remodeling the mill. We to make plans and system for the same free of charge. We to furnish a competent foreman millwright to superintend the work, at $5.50 per day and traveling expenses from Milwaukee and return. In consideration of the above we agree to guaranty that when the mill is completed, according to our plans and system, it shall have a daily working capacity of production of 400 barrels in excess of present capacity under equal conditions, and shall produce a barrel of flour of all grades from not more than $4\,^{16}/_{60}$ bushels of a mixture of ⅓ No. 1 hard, ⅓ No. 1 Northern, and ⅓ No. 2 Northern grades of spring milling wheat. The percentage of production of patent flour to be not less than 75 per cent., and equal to Pillsbury's Best of present quality, of which sample is to be sealed, and the percentage of low grade and Red Dog not to exceed 6 to 8 per cent. \* \* \* We agree to use our best endeavors to work all the men possible for completing the mill in the shortest length of time from shutting down, and should the Columbia Mill Company order more than above list of machinery, the prices to be pro rata as above. \* \* \* The Columbia Mill Company to pay freights and receive and unload machinery at mill, furnish all labor, lumber, hardware, belting, cups, ironwork, &c., to place above machinery in running order, and furnish labor, wheat, and power for demonstrating results above guarantied, and on satisfactory completion of this contract and guaranty, to accept same and relieve us of further responsibility.

"Yours, truly, The Edw. P. Allis Co., by Harrison.

"Accepted.

"Columbia Mill Company,
"E. Zeidler, Treas.

"Approved Aug. 8th, 1890.
"W. W. A."

The work of enlarging and remodeling the Columbia Mill, referred to in the foregoing proposal, was commenced under the direction of the Edward P. Allis Company some time in August, 1890, and was concluded about the 6th of December following. A controversy thereafter arose between the parties as to whether the mill as remodeled had the guarantied producing capacity aforesaid, and on May 24, 1892, the Columbia Mill Company brought suit against the Edward P. Allis Company, alleging, in substance, that the mill as enlarged and remodeled did not have a capacity of 400 barrels of flour in excess of its former producing capacity, and that it would not make a barrel of flour from $4\,^{16}/_{60}$ bushels of the mixture of the grain mentioned in the contract, and that it would not yield the requisite 75 per cent. of patent flour equal to Pillsbury's Best.

On the 13th of June, 1892, the Edward P. Allis Company also brought an action against the Columbia Mill Company for an alleged balance of $2,995.30,

said to be due to it under the provisions of the aforesaid agreement. These suits were subsequently consolidated, and tried as one action in the circuit court of the United States for the district of Minnesota, and on such trial the circuit court directed that the Columbia Mill Company's complaint in the first suit above mentioned should be treated as a counterclaim interposed in the second suit. The trial was so conducted, and resulted in a verdict in favor of the Columbia Mill Company on its counterclaim in the sum of $21,966.70.

James G. Flanders and J. M. Shaw (Willard R. Cray, on brief), for plaintiff in error.

Anson B. Jackson, for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The alleged error in the proceedings of the trial court to which most prominence is given in the argument of counsel, consists in the admission of certain evidence showing the total output of the Columbia Mill for a period of about 57 days from December 9, 1890, to February 21, 1891, after the mill had been enlarged, and had been put in operation with the new machinery and appliances which the Edward P. Allis Company had contracted to furnish and put in operation. It is contended in behalf of the plaintiff in error that it was not competent for the Columbia Mill Company to establish a breach of the guaranty contained in the aforesaid contract, except by showing that the remodeled mill was subjected to the precise test mentioned in the contract in the presence of both parties or their representatives, and that on such trial it failed to satisfy the guaranty. Stating the proposition in a slightly different form, it seems to be claimed that the breach of the guaranty could only be proven by showing that the mill was set to work on some particular occasion with a view of testing its capacity, on a particular mixture of wheat, such as is described in the contract, and that on such trial it failed to produce 400 barrels of flour in excess of its former capacity, or that it failed to produce a barrel of flour from $4^{16}/_{60}$ bushels of wheat, or that it failed to yield 75 per cent. of patent flour equal to Pillsbury's Best. Hence it is urged that the evidence tending to show the entire output of the mill for some 57 days after it was set to work was not only immaterial, but that it was also incompetent evidence, because, during the greater portion of that period, the mill was not provided with the requisite mixture of grain consisting of one-third No. 1 hard, one-third No. 1 Northern, and one-third No. 2 Northern spring milling wheat, and because the mill was not run during that time with a view of testing its capacity. We think that this view of the case fails to distinguish, as it should, between the standard of excellence prescribed by the contract and what was competent evidence to prove that that standard had or had not been attained. These are essentially different matters. The parties certainly did not agree in express terms that if a controversy should arise with respect to the capacity of the remodeled mill, that question should be determined solely by a trial made in the presence of both parties,

with wheat of a given mixture, and that all other evidence tending to throw light on the capacity of the mill should be excluded, except the results of such a test. Suppose, for example, that on the completion of the mill, it had been impossible to obtain the contract mixture of wheat with which to make a test of its producing capacity, could it have been successfully maintained that the failure of the mill company in that respect operated to preclude it from obtaining relief for a breach of the guaranty by showing by other evidence at its disposal that the mill did not have the requisite producing power? It might happen—and such would be a very probable supposition— that the inability of the mill to produce 400 barrels of flour in excess of its previous capacity could be readily shown by testing it with a number of different mixtures of wheat other than that specified in the contract, or it might be that the mill company would be able to demonstrate to the satisfaction of any intelligent person, by testing it in a variety of ways, that in no event could the mill be made to produce a barrel of flour from $4\,^{16}/_{60}$ bushels of wheat of any grade or mixture. The quantity of flour that a particular mixture or grade of wheat will produce, in comparison with other mixtures or grades, is usually well known to experts, and it seems quite probable that the producing capacity of the mill in question, and its power to make the quantity and quality of flour specified in the contract, could have been determined with a high degree of certainty without subjecting it to a trial with such a mixture of particular grades of wheat as was mentioned in the guaranty. In the case above supposed (that is to say, in case of the inability of the parties to obtain the contract mixture of wheat), we think that the law would not be so unreasonable as to hold that the agreement between the parties contemplated that in case of a controversy as to the producing capacity of the mill a test must be made with the particular mixture of wheat mentioned in the contract, and that all other evidence tending to show its producing capacity should be excluded. The truth is, we think, that the contract in suit simply fixed a certain standard of capacity for the enlarged and remodeled mill, and left the parties at full liberty to show whether the mill had such a capacity by any evidence that might be conducive to that end. It does not, in express terms, limit the proof to establish a breach of guaranty to a test made with a particular mixture of grain, and we would not be authorized to read such a stipulation into the agreement, nor would it be reasonable to do so.

The objection to the testimony now under consideration also seems to be based upon another view of the contract to which we are unable to assent. Very much of the argument in opposition to the admissibility of the evidence, proceeds upon the assumption, as we understand, that all of the terms of the guaranty are limited by the condition that the grain used to produce the guarantied results shall consist of a particular mixture of wheat, to wit, that specified in the contract. We do not so understand the agreement. The guaranty relative to the percentage of patent flour that the mill should yield, and relative to the production of a barrel of flour from $4\,^{16}/_{60}$ bushels of wheat, was undoubtedly made conditional upon

the use of a particular mixture of wheat, but, in our judgment, the stipulation to increase the output to the extent of 400 barrels per day was not thus limited. That stipulation seems to have been intended as an independent guaranty that the enlarged and remodeled mill, when set to work upon any grade of wheat, would produce 400 barrels of flour per day more than the old mill, out of grain of the same quality or grade. In other words, it was a guaranty of the increased capacity of the enlarged mill in comparison with the old mill, the only limitation being that they should be tried "under equal conditions."

It follows, we think, from this view of the case, that no error was committed in admitting the testimony tending to show the total output of the mill from day to day from December 9, 1890, to February 21, 1891, and the percentage of patent flour that was produced in the meantime. This testimony was clearly competent for the purpose of showing the capacity of the enlarged mill in comparison with its former capacity. Indeed, it was about the only testimony in support of that issue which could be produced, and its admissibility was in no wise affected by the fact that the mixture of grain specified in the contract had not been used during all of the period in question. We also think that the testimony was admissible with reference to the other provisions of the guaranty. There was evidence tending to show the following facts: That during the fifty-seven days to which the objectionable proof related a very large quantity of wheat (nearly 200,000 bushels) was ground into flour; that a great portion thereof was "straight No. 1 Northern spring wheat," which was well adapted to test the producing capacity of the mill, both as to the quantity and quality of the output; that in the meantime about 25,000 bushels of the exact mixture of grain specified in the contract was consumed or turned into flour, and that during the period in question an expert miller, who was in the employ of the Edward P. Allis Company, was constantly at work in the mill supervising its operation, and doing whatever was within his power to obtain the best possible results. Moreover, the record before us is replete with testimony, offered by both parties, showing in detail what was said and done during this period, what changes and improvements were made in the machinery, what power was employed to run it, and every other fact and circumstance which would tend to show whether the results obtained were or were not a fair test of the amount and quality of work that could be done by the remodeled plant. Viewed in relation to all the other facts and circumstances in evidence, we are of the opinion that the testimony showing what the mill had actually accomplished during a period of 57 days tended to throw much light on the question, not only whether the mill had the requisite producing capacity, but on the further question whether it would in fact yield the specified amount and quality of flour from $4\,^{16}\!/_{60}$ bushels of grain of the kind mentioned in the guaranty. The record made by the mill for a period of 57 days under the conditions aforesaid warranted important inferences, which the jury was entitled to draw, as to what the mill could do in the way of fulfilling the exact conditions of the guaranty.

We think, therefore, that the testimony in question, instead of having a tendency to mislead the jurors, as counsel assert, had an opposite tendency, and was well calculated to aid them in reaching a correct conclusion with respect to the questions which they had to decide.

In concluding this branch of the discussion it is also important to observe that the position assumed by the plaintiff in error in this court seems to be somewhat at variance with its position in the trial court. It is contended here, as above stated, that the breach of the guaranty could only be established in a lawful manner by proof of the results of a particular test made with a certain mixture of grain such as is described in the contract. In the circuit court, however, it was alleged, in substance, by the plaintiff in error, in answer to the counterclaim, and such was its attitude before the jury, that the parties had agreed that other and different wheat than that specified in the contract might be used for the purpose of demonstrating the capacity of the enlarged mill, and that when tested with such other and different wheat, it did in fact fulfill substantially all of the conditions of the guaranty. In view of this allegation, it seems hardly necessary to add that it overcomes every possible objection which the plaintiff in error can make to the admissibility of the testimony showing the record made by the mill during the 57 days subsequent to its completion, for, beyond all question, if the mill was ever subjected to a trial by agreement of the parties with any mixture or grade of grain, it was during the period aforesaid, and the plaintiff in error cannot complain because the record of the mill during that period was exhibited to the jury.

It is further assigned for error that the circuit court erred in refusing to strike out and to exclude from the consideration of the jury an opinion expressed by one of the witnesses for the mill company relative to the rental value of the enlarged mill. This testimony was offered by the mill company for the purpose of showing its damages in case the jury found that the guaranty had not been fulfilled. The witness expressed the opinion, in substance, that if the enlarged mill, when completed, had possessed the requisite contract capacity, its rental value would have been from $4,000 to $4,750 per month. Other evidence tended to show that it would probably take two months to overcome the existing defects in the mill by making the necessary alterations, and that in the meantime the mill company would lose the use of the plant. On the cross-examination of this witness it was developed that in forming his estimate of the rental value he had taken into consideration the number of barrels of flour that the mill would make per day, the cost of production, and that he had based his opinion as to the rental value upon the assumption that the mill would yield on the average a net profit to the person operating it of 10 cents per barrel for each barrel produced. Thereupon the plaintiff in error objected to the testimony, and moved to exclude the opinion which the witness had previously expressed. This motion was not based upon the ground that the witness was not competent to testify as an expert, nor upon the ground that the rental value of the plant while it was compelled to lie idle undergoing alterations was an improper item of damage. The sole ground

of exception to the testimony seems to have been that it authorized the mill company to recover damages for a supposed loss of net profits. We are unable to concur in this view. The witness did not say, as we understand, that "rental value" and "net profits" were synonymous terms, and that he had expressed his opinion on that assumption. What he did say, in substance, was that mill owners, in estimating the rental value of such property, were in the habit of considering its producing power and probable earning capacity; that this was the way the rental value of such property was usually fixed and determined, and the only practicable way in which it could be ascertained; and that in forming an opinion as to the rental value of the property in question he had proceeded in the customary manner. We think, therefore, that the facts developed on the cross-examination of this witness were insufficient to render his opinion as to the rental value illegal testimony. The competency of the evidence depended upon the fact that the matter at issue warranted the introduction of expert testimony; that the witness was confessedly well qualified to express an opinion; and that he assumed to do so, stating, in substance, that a certain sum per month represented, in his judgment, the fair rental value of the property. The manner in which such judgment had been formed, as disclosed by the cross-examination, did not render the evidence incompetent, but, at most, only affected its weight or credibility. Moreover, as the plaintiff in error did not offer any rebutting testimony on the subject of rental value, it is fair to presume either that the opinion expressed was substantially correct, or that the plaintiff in error did not attach much importance to this feature of the case. The court, we think, committed no error in refusing to exclude the opinion in question.

Some other errors have been assigned upon the record, but they are of less importance than those heretofore considered, and a careful examination of the same has satisfied us that they are without merit, and that they are not deserving of particular notice. Error has also been assigned on account of the denial of the motion for a new trial by the trial court, but we have so often held, in common with other federal courts, that we cannot notice an error of that kind, that nothing need be said on that subject. Railroad Co. v. Howard, 4 U. S. App. 202, 1 C. C. A. 229, 49 Fed. 206; Railroad Co. v. Charless, 7 U. S. App. 359, 388, 2 C. C. A. 380, 51 Fed. 562. A careful inspection of the entire record has served to convince us that no error was committed which would justify this court in granting a retrial, wherefore the judgment of the circuit court is hereby affirmed.